| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE OFFICE OF<br>ADMINISTRATIVE HEARINGS |
| COUNTY OF ORANGE | 20 EDC \_\_\_\_\_ |

| | |
|---|---|
| D.A., by and through his parents, D.A. Sr. and S.A., )<br>)<br>)<br>PETITIONERS, )<br>)<br>v. )<br>)<br>Chapel Hill-Carrboro City Schools Board of )<br>Education, )<br>)<br>)<br>RESPONDENT. ) | **PETITION FOR A<br>CONTESTED CASE HEARING**<br>(Special Education)<br><br>**INVOKING STAY-PUT**<br>**(20 U.S.C. § 1415(j))** |

RECEIVED SEP 27 2020 Superintendent's Office

## INTRODUCTION

COME NOW the Petitioners, by and through legal counsel, and file this Petition for a Contested Case Hearing and assert these allegations against the Chapel Hill-Carrboro City Schools ("CHCCS") Board of Education pursuant to Section 504 of the Rehabilitation Act of 1973, § 504(a), 29 U.S.C. 794(a); Title II of Americans with Disabilities Act (ADA) of 1990, § 202, 42 U.S.C. § 12132; the Individuals with Disabilities Education Improvement Act of 2004, 20 U.S.C. §§ 1400 *et seq.* ("IDEA"); N.C. Gen. Stat. §§ 115C-109.6 *et seq.*; and Article 3 of Chapter 150B of the General Statutes.

This Petition is based upon a dispute regarding the denial of a free and appropriate public education (FAPE) to D.A. by CHCCS. Specifically, CHCCS failed to: Develop a substantively and procedurally appropriate IEP that was reasonably calculated to enable D.A. to make progress appropriate in light of his circumstances; appropriately evaluate D.A.'s educational needs; comply with the procedural requirements of the IDEA, which resulted in educational harm, provide parental participation, or prevent the loss of educational benefit to D.A.; follow the requirements set forth in the IDEA; and follow the requirements of the North Carolina state law as set forth in N.C. Gen. Stat. §§ 115C-109.6 *et seq.*

Petitioners hereby invoke D.A.'s "Stay Put" Rights (20 U.S.C. § 1415(j)) as set forth immediately below throughout the pendency of this hearing and any subsequent appeals.

During the 2019-2020 school year, D.A. qualified for and received direct special education instruction pursuant to an IEP dated February 17, 2020, including 250 minutes daily of specially designed instruction in a special education classroom, 45 minutes 6 times per reporting period of speech-language services, and 30 minutes 7 times a reporting period of occupational therapy.

1

In March 23, 2020, Governor Cooper issued an Executive Order ordering all school buildings closed for in-person services through May 15, 2020, and ultimately through the end of the 2019-2020 school year. Respondent developed an At-Home Learning Plan that it contended would be modified to be "accessible and reasonable in light of our [EC] students' unique needs." However, D.A. was unable to access the services due to his disabilities.

In July 14, 2020, Governor Cooper announced in-person instruction under Plan B that required face coverings for all K-12 students, fewer children in the classroom, and other safety protocols. Governor Cooper also gave each school district the option of selecting Plan C and providing virtual instruction. Respondent selected Plan C for the entire first semester for all students.

On August 28, 2020, D.A.'s IEP team met to discuss an "Online Instruction Service and Support Plan and Temporary IEP Addendum for Students with Disabilities." The CHCSS decided over the objection of Petitioners to change D.A.'s IEP goals because they could not be provided remotely and provide online special education instruction to D.A., remote and in-person instruction for occupational therapy, and speech. Respondent notified D.A.'s mother that "some or all of [his speech therapy] services will be offered through remote delivery anytime this school year when the district is in Plan B or Plan C." According to Respondent, "[p]articipation in remote delivery of related services is voluntary . . . however . . . services declined will not be made up later." Petitioners requested CHCCS provide D.A. with in-person services consistent with his current IEP.

On September 9, 2020, the IEP team met and Petitioners again requested that CHCCS continue to provide D.A. with direct instruction face-to-face instruction in the school building. CHCCS refused the Petitioners' proposals and decided to keep D.A. on a Modified Contingency Plan which provides D.A. with remote instruction, modifies goals that cannot be implemented remotely as written, reduces D.A.'s services, and would require D.A. to receive speech therapy on a virtual platform. Petitioners provided Respondent with the requisite notice that the plan offered does not provide D.A. a free appropriate public education; therefore, Petitioners intend to seek private services or enroll D.A. in a private school where he can receive appropriate instruction that he can access and seek reimbursement from the district.

## INVOCATION OF "STAY PUT" RIGHTS PURSUANT TO 20 U.S.C. § 1415(j) AND SUMMARY OF THE CASE

This Petition challenges the decision of the CHCCS to reduce and/or remove D.A.'s direct in-person instruction, reduce his service delivery time, and change his IEP goals. This decision was made over the objections of D.A.'s parents, who do not agree D.A. is provided a FAPE through remote instruction due to his disabilities. D.A.'s parents requested D.A. receive in-person instruction pursuant to his IEP dated February 17, 2020 which represents his current educational placement.

Petitioners demand, pursuant to 20 U.S.C. § 1415(j) and N.C. Policy 1504-1.19, that during the pendency of this proceeding and any subsequent appeals, D.A. maintain his goals that as well

as his service delivery in D.A.'s current educational placement.

## FACTUAL ALLEGATIONS

In support of this Petition, the Petitioners incorporate herein by reference and fully restate the Introduction and Summary of the Case herein and allege as follows:

1. The student's name is Daniel Attaway (D.A.). He is eighteen (18) years old, and his date of birth is June 26, 2002. D.A.'s mother is Sherry Attaway (S.A.). D.A.'s father is Daniel Attaway, Sr. (D.A.SR.). D.A. resides with his parents at 109 Quailview Dr., Chapel Hill, North Carolina 27516, in Orange County, North Carolina.

2. S.A. is appointed as D.A.'s guardian of the person pursuant to Letters of Appointment issued on June 2, 2020 by the Orange County Clerk of Superior Court.

3. D.A. has been diagnosed with Potocki Lupski Syndrome[1] in 2003 by the University of Washington in Seattle, Washington.

4. D.A. is eligible for special education services with a primary category of Multiple Disabilities (MU).

5. D.A. is a student in CHCCS who is enrolled in eleventh grade at Chapel Hill High School for the 2020-2021 school year.

6. D.A. is on the Extended Core Curriculum.

### *Background*

7. D.A. enrolled in the eighth grade at the CHCCS in August 2016.

8. On September 20, 2016, CHCCS convened an IEP team to discuss D.A.'s out of state IEP, discuss a comparable services plan, and conduct vision and hearing screenings.

9. D.A. last psycho-educational evaluation was conducted in 2014 when D.A. was in the sixth grade and attending middle school in California. The evaluator did not complete any formal cognitive assessments as D.A. was unable to complete sample items. Previous assessments indicate D.A.'s cognitive functioning to be in extremely low range.

---

[1] According to the 2014 report, "Potocki Lupski Syndrome (PTLS) is a rare contiguous gene syndrome. The following traits are often associated with PTLS: failure to thrive (in infants), low muscle tone, poor fine motor skills, affectionate, happy friendly children, speech delays, developmental delays, Autism-like behaviors, Obsessive Compulsive Disorder, sensory integration disorders, ADD/ADHD (which tends to calm down greatly in teen years), and memory issues."

3

10. D.A.'s overall adaptive skills are in the extremely low range.

11. The examiner conducted the Gilliam Autism Rating Scales-2 (GARS) and neither provided nor disclaimed a diagnosis of autism. He notes one of the traits of PTLS is behavioral characteristics similar to those with autism. D.A. has a developmental disability significantly affecting verbal and nonverbal communication and social interaction.

12. The IEP team developed D.A.'s initial CHCCS' IEP on October 20, 2016. The IEP contained goals for communication, occupational therapy, activities of daily living, vocabulary, vocational, behavior, adaptive PE, functional academics, completing a lunch routine, self help (teeth brushing, washing hands, and gathering lunch utensil), and social/emotional skills.

13. D.A. uses an Augmentative and Alternative Communication (AAC) device for communication.

14. In August 2017, D.A. transitioned to Chapel Hill High School.

15. D.A.'s IEPs consistently reflect from middle school to the present, "after graduation from high school, [D.A.] will be employed in the landscaping field."

### *2019-2020 School Year*

16. In August 2019, D.A. began his eleventh-grade year at Chapel Hill High School.

17. On February 17, 2020, the CHCCS convened an IEP meeting to conduct D.A.'s annual review. The IEP team developed an IEP with goals in daily living skills, math, communication skills, language arts, and pre-vocational skills.

18. The February 17, 2020, IEP contains scant information about D.A.'s strengths.

19. The parents' concern is for D.A. to use his device more and have more social inclusion with more typical peer groups.

20. D.A.'s employment goal in his Transition Plan is for him to work part-time through supported employment in the field of horticulture of animal care.

21. The postsecondary supports in the IEP inexplicably required D.A. and his parents to be the responsible person along with the CHCCS.

22. The IEP has present levels for math, communication, transition, expressive language, and "acquisition and use of knowledge and skills."

23. The CHCCS failed to provide D.A. with present levels in motor skills, language arts, independent living, and behavior although his services delivery contains daily living skills

4

and language arts. D.A. has behavior needs which are not addressed in the IEP.

24. The present levels are inappropriate as they fail to fully describe D.A.'s needs or provide baseline data from which to measure progress. By way of example and not limitation, the math present level states as follows:

> [D.A.] is working on recognizing, identifying, and counting out up to 7. Since adding food items for him to count, [D.A.] has done much better. Since he is supposed to be doing algebraic equations at this point, specially designed instruction at a slower pace is what best meets Daniel's needs at this time.

25. D.A.'s communication present level is astonishing in its lack of detail: "[D.A] is much more comfortable using his device this year. He will advocate for himself when he want's [sic] or needs something. The goal is for Daniel to be as independent as possible and using the device as his voice across all settings."

26. D.A.'s present levels do not always match his IEP goals for a particular academic or functional area:

| | |
|---|---|
| **Math:** Daniel is working on recognizing, identifying, and counting out up to 7. Since adding food items for him to count, Daniel has done much better. Since he is supposed to be doing algebraic equations at this point, specially designed instruction at a slower pace is what best meets Daniel's needs at this time. | Given a quantity up to 10, Daniel will correctly recognize, identify, and count out up to 10 items in 4 out of 5 opportunites [sic]. |
| **Communication:** Daniel is much more comfortable using his device this year. He will advocate for himself when he want's or needs something. The goal is for Daniel to be as independent as possible and using the device as his voice across all settings. | Within one year, when given an errand, a simple 3-step script to follow and his AAC device, Daniel will independently navigate from his home page to engage in a simple errand activity with less than 3 prompts on 4 out of 5 opportunities. Using his AAC system, Daniel will participate in 4 structured language activities by responding at the 3 step script responses to answer who, what, where questions; express feelings (i.e.: "need a break") , or use greetings with no more than 2 prompts per activity in 4 of 5 trials. |

5

| | |
|---|---|
| **Transition:**<br>Daniel does a good job with tasks he is given at work. He still tends to look at whoever is working with him but is able to focus more on the task at hand than earlier in the year which is progress. For tasks that involve fine motor skills, Daniel requires hand over hand assistance to learn the steps of each new task. Sometimes he gets frustrated or distracted by activities going on around him. When he doesn't want to do a task, he will state "all done" using his AAC device and/or push the teacher away and walk away from the work area. He continues to work on increasing his independence with functional work and self help skills within his classroom setting, i.e.: washing dishes, folding, managing, cutting food with a knife and managing buttons. Based on Daniel's current performance, he continues to demonstrate the need for specialized instruction that will support building his endurance and focus on his work tasks, in order to make him as independent as possible. | Within one year, when given a variety of kits to assemble, Daniel will demonstrate the ability to complete 5-highly structured kits with no more than 2 prompts per task on 4 out of 5 opportunities.<br><br>Given set up and supervision, Daniel will participate in familiar classroom/ vocational/school self help tasks with 5 or fewer, verbal and physical prompts in 4 of 5 opportunities. |
| **Language-Expressive**<br>Daniel is doing well using his device to participate in class discussions. He is much more confident and comfortable this year than last. He is becoming much more independent. | Within one year, Daniel will navigate from his home page on his AAC device to engage in 5 structured activities appropriately with less than 3 prompts per activity on 4 out of 5 opportunities. |
| **Acquisition and Use of Knowledge and Skills**<br>Daniel enjoys watching music videos and monster truck videos on his iPad. The goal is to get Daniel to do more educational activities on the iPad during the school day. | Within one year, when working on an interactive, educational computer program with a touch screen, Daniel will engage and participate in the activity for 6 minutes with no more than 3 prompts on 4 out of 5 opportunities. |

27. The goals reflect exceedingly low expectations for D.A. and are not appropriate for his academic, functional, and vocational needs.

28. Due to the lack of current evaluations and appropriate present levels with qualifiable baseline data, the IEP goals are not measurable or realistic for D.A.

29. Numerous goals only require participation without any level of proficiency. By way of example and not limitation, D.A.'s transition goal does not require learning any skill related to his employment goal: "Given set up and supervision, Daniel will participate in familiar

6

Case 1:20-cv-01015-UA-JLW   Document 8   Filed 11/12/20   Page 6 of 14

classroom/vocational/school self help tasks with 5 or fewer, verbal and physical prompts in 4 of 5 opportunities."

30. Several present levels and/or goals indicate D.A. requires hand-over-hand assistance or physical prompts.

31. D.A.'s transition present level indicates for tasks that involving fine motor skills, D.A. requires hand-over-hand assistance to learn the steps of each new task.

32. His transition goal requires the ability of his teacher to use of physical prompts: "Given set up and supervision, Daniel will participate in familiar classroom/vocational/school self help tasks with 5 or fewer, verbal and physical prompts in 4 of 5 opportunities."

33. The February 17, 2020, IEP also provides D.A. the related services of occupational therapy, speech-language therapy, and transportation.

34. Despite his parents' request that he spend more time with typically-developing peers, the February 18, 2020, IEP contains no supplemental aids, services, accommodations or modifications that would enable him to access and participate in the general education classroom.

35. For the supports for school personnel, the IEP indicates "[t]he assistive technology team should provide training and support to [D.A.]'s new IEP team members in the use of strategies to facilitate [D.A.]'s communication development. Occupational therapy consultation will provide support to [D.A.] and teaching staff regarding modifications and adaptive strategies for classroom tasks and vocational activities in the community."

36. The February 17, 2020, IEP includes 250 minutes daily of specially designed instruction, 45 minutes 6 times per reporting period of speech-language services, and 30 minutes 7 times a reporting period of occupational therapy.[2] All service are to be provided in the special education classroom.

37. On March 16, 2020, the CHCCS closed due to COVID-19 along with all North Carolina public schools.

38. During the period of time from March 16, 2020, to the end of the school year, the CHCCS failed to provide D.A. with any instruction that he was able to access.

---

[2] The related services also include the provision of supplemental aids/services/accommodations/modifications for OT and speech, although not supplemental aids/services/accommodations/modifications are contained within the IEP. Speech-language does support the communication and expressive language goals, and OT does support the transition goals.

2020-2021 School Year

39. On August 28, 2020, D.A.'s IEP team met to discuss an Online Instruction Service and Support Plan and Temporary IEP Addendum for Students with Disabilities or Modified Contingency Plan (MCP).

40. The CHCSS decided over the objection of Petitioners to change D.A.'s IEP goals because they could not be provided remotely and only provide online special education instruction to D.A., remote and in-person instruction for occupational therapy, and speech.

41. D.A. has a Behavior Invention Plan the CHCCS last reviewed on February 26, 2018. The plan targets D.A.'s aggression.

42. Petitioners requested CHCCS provide D.A. with in-person services consistent with his IEP. Even when Petitioners requested a cogent explanation, the CHCCS failed to provide reasons for the denial of in-person services for D.A. The only reason CHCCS provided for why it was unwilling to provide services that would allow D.A. to access and make progress, Petitioners was CHCCS was only implementing virtual learning in the district along with CDC and NCDHHS recommendations and guidelines.

43. However, the CDC and NCDHHS did not recommend providing on virtual learning. To the contrary, the CDC noted "in-person learning is in the best interest of students, when compared to virtual learning. Application and adherence to mitigation measures provided in this document and similar to those implemented at essential workplaces can help schools reopen and stay open safely for in-person learning."

44. The CHCCS is not prohibited from providing in-person services. Respondent has chosen to do so knowing many of its students with disabilities are unable to access remote learning.

45. Petitioners reported to the IEP team, based on their experience in the spring of 2020, D.A.'s IEP cannot be successfully implement with online learning. D.A. closes his compute and becomes disinterested in the videos presented as online instruction.

46. The CHCCS did not provide any data regarding D.A.'s success or lack of success with remote instruction. In fact, they did not discuss or provide any data to guide the team's decisions at the IEP meeting.

47. Petitioners requested the IEP team work together to find more creative solutions to serve D.A. As an example, they provided information regarding what the YMCA is providing.

48. The Petitioners requested compensatory education services to make up for the absence of services that D.A. could access during remote instruction. The CHCCS reported they "could not speak to district funding and/or make future decisions regarding compensatory services."

49. The LEA representative offered to share the Petitioners concerns and requests with the

8

district. CHCCS failed to provide a cogent and responsive explanation for the refusal of compensatory services.

50. The IEP team did not finalize the Online Instruction Service and Support Plan (OISSP) at the August 28, 2020, IEP meeting and agreed to meet again.

51. On September 9, 2020, the IEP team met again, and Petitioners, again, requested the CHCCS provide D.A. with direct instruction face-to-face instruction in the school building as outlined in his IEP. CHCCS refused Petitioners' proposals and decided to keep D.A. on a Modified Contingency Plan (MCP), which provides D.A. with remote instruction and modifies goals that cannot be implemented remotely as written.

52. The speech-language therapist reported there are elements of D.A.'s speech goals which cannot be met remotely.

53. The MCP significantly reduces the services delivery, even virtual service delivery, that D.A. would receive:

| Service | Frequency & Duration of Live Services in Feb. 2020 IEP | Frequency & Duration of Live Services in Sept. 2020 MCP |
|---|---|---|
| Daily Living | 5/week for 50 minutes | 2/week for 45 minutes |
| Math | 5/week for 50 minutes | 2/week for 45 minutes |
| Communication Skills | 5/week for 50 minutes | 2/week for 45 minutes |
| Language Arts | 5/week for 50 minutes | 2/week for 45 minutes |
| Pre-Vocational Skills | 5/week for 50 minutes | 2/week for 45 minutes |
| Occupational Therapy | 7/rep. pd. for 30 minutes | 7/rep. pd. For 30 minutes[3] |
| Speech/Language | 6/rep. pd. for 45 minutes | 6/rep. pd. For 45 minutes |

54. At the September 2020 IEP meeting, the Petitioners also requested the IEP team make a determination about Extended School Year (ESY) services, as D.A. had regressed significantly since Respondent stopped providing in-person instruction or any instruction D.A. could access.

55. D.A.'s parents informed the IEP team of D.A.'s regression in his behavior and his ability to communicate using his AAC device in addition to his academic skills.

56. Rather than consider the data provided by the parents who were the only ones collecting data on D.A.'s progress for the past six (6) months, the team determined it did not have all

---

[3] Although the service delivery appears to be offered either in the Special Education setting or virtual setting, at present all services are only offered virtually.

9

the data to a make determination and could not determine what those services might entail next summer. Petitioners requested the CHCCS take data on regression.

57. D.A.'s parents rejected all the changes Respondent was seeking to make to D.A.'s IEP, as well as the MCP. They requested face-to-face instruction, which Respondent again denied.

58. Petitioners informed the IEP team the current IEP and MCP failed to offer D.A. a free appropriate public education.

59. Petitioners then provided the IEP team with the requisite notice that they intended to seek a private placement or private services for D.A. and would seek reimbursement from Respondent for those services.

## SUMMARY OF ALLEGATIONS

CHCCS violated the IDEA, its implementing regulations promulgated pursuant to the Act, and state law in the following ways:

1. CHCCS failed to employ proper evaluation and placement procedures.

2. CHCCS failed to make decisions with respect to D.A. based on his unique needs.

3. CHCCS failed to develop a substantively and procedurally appropriate IEP that was reasonably calculated to enable D.A. to make progress appropriate in light of his circumstances.

4. CHCCS predetermined D.A.'s placement.

5. CHCCS changed D.A.'s service delivery, decreasing his instruction time for all IEP goals over parental objection based on administrative convenience.

6. CHCCS failed to develop appropriately ambitious IEP goals designed to meet D.A.'s unique needs based on measurable and valid baseline data.

7. CHCCS failed to implement D.A.'s IEP.

8. The CHCCS significantly impeded D.A.'s parents' ability to meaningfully participate in the development of D.A.'s IEPs and significantly impeded D.A.'s parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to D.A.

10

## RESOLUTION OR REMEDY SOUGHT

Petitioners seek as the resolution or remedy of this contested case the following:

1. That the Administrative Law Judge (ALJ) order Respondent to continue D.A.'s last agreed upon placement for IEP goals and services and throughout the pendency of this administrative proceeding;

2. That the Administrative Law Judge (ALJ) find that CHCCS violated the procedural and substantive requirements of the IDEA, state law, and state and federal regulations, thus denying D.A. a free and appropriate public education;

3. That the ALJ order Respondent to pay for any independent assessments deemed necessary, if the CHCCS is unable or unwilling to timely perform the assessments;

4. That the ALJ order Respondent to convene an IEP Meeting to review the results of D.A.'s evaluations, and develop an appropriate IEP with specific, measurable, ambitious goals that address D.A.'s unique needs and are designed in accordance with the method of communication used by D.A. and his family;

5. In the alternative, that the ALJ order Respondent to convene an IEP meeting to develop a new IEP and place D.A. in an appropriate private school where D.A. can receive full-time, in-person instruction;

6. That the ALJ order Respondent to provide D.A. with compensatory special education and related services for the amount of time the ALJ determines a FAPE was denied;

7. That the ALJ order Respondent to reimburse Petitioners any expenses incurred as a result of Respondent's failure to meet the requirements of the IDEA, state law, and state and federal regulations, including but not limited to, private school tuition, transportation, and any other costs and expenses incurred for D.A. to attend any private therapies and the costs and expenses incurred for any private evaluations;

8. That the ALJ declare that the Petitioners are the prevailing party and are entitled to attorneys' fees; and

9. Such other additional or alternative relief as the ALJ finds appropriate.

11

Respectfully submitted, this the 18th day of September, 2020.

/s/Stacey M. Gahagan
Stacey M. Gahagan
N.C. State Bar No. 44393
3326 Durham Chapel Hill Blvd., Suite 210-C
Durham, NC 27707
Telephone: (919) 942-1430
Email: sgahagan@ncgplaw.com

12

Case 1:20-cv-01015-UA-JLW   Document 8   Filed 11/12/20   Page 12 of 14

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing **Petition for a Contested Case Hearing** has been served upon all parties via electronic delivery by using the e-NCOAH system and by mailing a copy thereof, postage prepaid, addressed to the following:

>Jim Causby
>Interim Superintendent
>Chapel Hill Carrboro City Schools Board of Education
>750 S. Merritt Mill Rd.
>Chapel Hill, NC 27516

and, as required by N.C. Gen. Stat. § 109.6(h), to the person designated by the State Board of Education under N.C. Gen. Stat. § 115C-107.2(b) via electronic filing to:

>Teresa King
>Consultant for Due Process and Parents' Rights
>N.C. Dept. of Public Instruction

This the 18th day of September, 2020.

/s/Stacey M. Gahagan
GAHAGAN PARADIS, PLLC


RECEIVED
SEP 27 2020
Superintendent's Office


CERTIFIED MAIL
7018 1830 0001 7664 2323



GAHAGAN PARADIS
3326 Durham-Chapel Hill Blvd., Suite 210-C
Durham, NC 27707

Jim Causby
Interim Superintendent
Chapel Hill Carrboro City Schools Board of Education
750 S. Merritt Mill Rd.
Chapel Hill, NC 27516